MOYE v. BEAUMONT, S. L. & W. RY. CO.
(No. 68–2823.)

(Commission of Appeals of Texas, Section B. May 28, 1919.)

1. RAILROADS ⬡⟿350(13)—INJURY AT CROSSING—CONTRIBUTORY NEGLIGENCE — QUESTION FOR JURY.

In an action against a railroad for death of plaintiff's son while driving an automobile at a crossing, question of the son's contributory negligence *held* for the jury.

2. RAILROADS ⬡⟿346(5)—INJURIES AT CROSSING—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.

In an action against a railroad for death of plaintiff's son struck in an automobile at a crossing, the burden rested on the railroad to establish the son's contributory negligence excusatory of its own negligence.

Error to Court of Civil Appeals of First Supreme Judicial District.

Action by M. F. Moye against the Beaumont, Sour Lake & Western Railway Company. From judgment for plaintiff, defendant appealed to the Court of Civil Appeals, which reversed (174 S. W. 697), and plaintiff brings error. Judgment of the Court of Civil Appeals reversed, and that of the trial court affirmed.

Smith, Crawford & Sonfield, of Beaumont, for plaintiff in error.

Andrews, Streetman, Burns & Logue, of Houston (W. L. Cook, of Houston, of counsel), for defendant in error.

SADLER, J. The plaintiff in error recovered a judgment against the Beaumont, Sour Lake & Western Railway Company for

the death of his son, Alfred Moye. The young man was killed at Grayburg, Tex., being struck by a freight train of defendant in error while he was endeavoring to cross its track on the public highway. He was driving an automobile. One of the defenses insisted upon by the railway company was the contributory negligence of the plaintiff. The Court of Civil Appeals held that plaintiff was guilty of contributory negligence, as a matter of law, and reversed and rendered the cause for the defendant. Writ of error was granted on the application of the plaintiff. For a statement of the facts upon which the Court of Civil Appeals based its decision, see 174 S. W. 697.

We think it necessary to give a more extended statement of the evidence touching upon the question of contributory negligence.

Alfred Moye was employed as a laborer and as a driver in a garage at Sour Lake. On the morning of the accident he was sent to Grayburg for a party who desired to come to Sour Lake. Shortly after leaving Sour Lake Miss Ellen Cowart and Miss Bonnie Belle Parr were picked up by him, and were riding on the rear seat of the automobile. After taking the young ladies in the car, he drove at a very fast pace, until he reached a hotel at Grayburg, situated about one block north of defendant's railway line. He was driving upon a shell road, which ran through the town of Grayburg from north to south. The defendant's line of road crossed this highway, and ran east and west. Its passenger station was situated some distance east of the point where the public road crossed the railroad track. The railway company had been repairing and ballasting its main line through Grayburg. At the point where the public road crossed, there were two tracks, the main line and a house track, which left the main line about 10 or 12 feet west of the public road, and branched off to the south of the main track, extending beyond the depot. This house track, very shortly after branching from the main line, descended until it was some 18 inches lower than the main line, and extended south of the depot, connecting with the main line again at some distance east of the depot. About the time Alfred Moye reached the hotel, he slowed down, and was driving very slowly in the direction of the crossing. Just as the front of the car reached the main line it was struck by a box car, demolished, and the driver killed. The two young ladies were thrown out on the north side of the track, but were not injured. After striking the automobile, the box car and the other cars in the train continued to move until the box car was about three car lengths from the crossing.

Miss Cowart testified:

"I was with Alfred Moye at the time he was killed, and was in the car when it was struck.

Bonnie Belle Parr was with me. We were in the rear seat. Alfred was driving. After we got in the automobile, Alfred ran fast, until we got right in front of the King's Hotel, and then he commenced to go slow. The King's Hotel is before you get to the railroad track. It is not right close, but I don't know just how far. I am not able to state the distance. At the time we got to the hotel, he looked back, and said, 'How do you like that?' and I said, 'Fine'; and he never looked back any more. It was then that he changed his speed, right in front of the hotel; but up to that time he had been running pretty fast. He got slow right in front of the hotel. From that point on he was going slow. I don't know just exactly how slow; for I cannot tell how many miles per hour an automobile runs. * * * Of course, when he came right up to the railroad and went onto the railroad, I suppose he got slower then. I don't know how far he had gotten upon the railroad, but he had not crossed it. I just had time to holler, 'There is a car,' and then it hit. I don't know which way I was looking. I just glanced around toward the car, and saw it before it hit. * * * I think it was a box car that hit us. I am not sure. * * * That was the first thing I saw about the accident. * * * When I thought of myself, I was sitting in the shell road, and Bonnie Belle was making me go home. * * * I don't know why I did not see the railroad car before I did. * * * When the automobile was struck, it was going slow. * * * I did not see any signal, and I do not know whether any one was there or not; but I did not see them. * * * I did not hear any bell ringing or whistle blowing. It made no noise that I heard before that. * * * As to the length of time before the box car struck the automobile, that I hollered, 'There is a car,' I just had time to say it before it hit. It was almost like the snap of the finger. * * * As to the time when I hollered, I do not know whether the automobile was actually on the track then or not; I am not sure. * * * I would say that I did not hear the whistle blow. * * * At the time the box car struck, the automobile was still in motion. * * *"

Bonnie Belle Parr testified:

"When he went upon the railroad, he was running still, as well as I remember. It is a high track there. As to whether the car came to a dead standstill, or whether it was moving, that is, the automobile, I am not sure; but I think it was moving; as well as I remember, it was moving. I did not see the box car at all. The first thing I knew, I was crawling out from under that old top; that is the first thing. * * * The jolt which that car got was hard enough to tear it all to pieces and to knock us out, without me seeing it or knowing anything about it. * * * I did not hear the car coming, and I heard no whistle or bell, or any signal of any kind. * * * I was facing toward the crossing, coming right down the shell road, and I was not looking behind me. * * * Yes, sir; I thought in going across that crossing that it was a good idea to listen and look for things. I guess maybe if I had been looking for cars like I was listening for that bell, I might have seen that car sooner; maybe I would, but I was looking right that way. * * * I do not know when this train of cars started to

moving, nor how close it was to the crossing when it started to moving. I did not see it from across the track going east just before we got there. Yes, sir; my face was toward the front. If that car had been coming for a long distance up this track, I believe I would have seen it."

### J. T. Bremmer testified:

"I went there in a car as quick as I could, along the shell road, from Sour Lake to Grayburg. This was in the middle part of the day, between 11:30 and 1 o'clock, something like that. No one else went with me. The first thing when I got there, the little Cowart and Parr girls were standing in the middle of the shell road; had just got out of the top of the car. * * * The flat car was standing over him, I think. The automobile was three car lengths down the track from his body on the main line and on the track, having been pushed ahead of the car. Between the shell road and the automobile as I found it there was one box car and some log cars they were fixing to take to Budconnor. The car next to the automobile was a box car, and the others were flat cars. * * * At that time the cars were still across the road and extending to the east back to the depot. You could not see the end standing in the shell road, because the depot cut the observation off. There was no engine about the shell road crossing; the engine was at the water tank. It is something like 200 yards from the shell road to the depot, but I did not count the cars. * * * The string of cars that struck the automobile was moving onto the main line in the south switch. * * * There were some cars on one of the other tracks, but I cannot state which track. I could not say how close they came up to the crossing, because I paid not much attention to those cars. I noticed them, but did not notice how close they were. They were tolerably close. I did not look for obstructions, and do not know whether those cars were on the switch or on the main line. There were cars on only one of the other tracks. They were either on the siding or on the main line, but I could not say which. They were flat cars, and with no engine attached to them about the crossing, but I do not know how many there were. The south switch track is a foot or so lower than the main line track—maybe 18 inches. It begins to fall just as it runs off the roadbed. The main line at the point of the accident is about 14 or 15 inches higher than the lay of the land. * * * Yes; I know where the King Hotel is; it is one block east of the shell road, and one block north of the railroad track. At the time of this accident, there were houses near the railroad track on the shell road, but they are not there now. I do not know when they were moved, but it was since the accident. One of these buildings was a residence, and the other was a kind of a little restaurant or short-order business. These were right on the edge of the shell road, and the little house was right close to the telephone post, and the big house was something like 40 or 60 feet back. The telephone post was right at the edge of the right of way, just about the distance telephones run alongside of railroads, right at the edge of the depot. This short-order house was a little house, and there was a space and then a dwelling house; both of them being right

along the shell road on the north side of the railroad, and on the opposite side from the depot. These houses were also on the east side of the dirt road, and on the side of the railroad towards Sour Lake, and would be passed by Alfred Moye in going to the railroad. I would estimate that the telephone post against which the little bittie short-order outfit stood was about 50 feet from the railroad track—hardly as far as the length of this room. This residence and this restaurant would occupy about 150 or 200 feet. As to how close one would get along that road going south approaching the railroad before he would get to where he would see from the small house after he emerged, it would be about 75 feet—maybe 100 feet—from the railroad track. Yes; I said the little house is about 50 feet from the railroad track; but I say that at a distance of between 75 and 100 feet he could have a clear view toward the depot and of the train on that south switch; but he would have to look across that way. If he kept his eyes looking that way, he could see. The box cars would be between the man approaching and emerging from behind the restaurant and the depot. They would be between him, and it would be about five or six car lengths from the shell road to the closest car of the string of cars that struck the automobile."

This witness says that those box cars standing on the main line or on the switch on the north side of the depot were something like 50 or 75 yards from the shell road —something like 150 to 225 feet—that is his recollection.

### T. S. Crosby testified:

"On that occasion I remember seeing some box cars there, but on which track I could not say. There were some box cars on the east side of the shell road on the left side as you approach the crossing going south. I do not remember how close they were to the shell road— somewhere between the shell road and the depot. I do not remember how many cars there were; there was a string of them. I do not know how far the depot is from the shell road; I suppose about 100 steps. The engine that was attached to the train that ran over the boy was on the south side of the depot when I got there. * * * That south track comes into the main line at the crossing right in the shell road, and leads off slightly to the south, and hooks around the depot; * * * that string of cars extending from the point where I found the automobile back to the depot. * * * There were three cars that had passed the crossing, and one car was standing over the crossing. * * * The body was still there when I got there, and the coroner held the inquest while I was there. * * * If a string of cars and an automobile met at a crossing, both of them getting there practically the same time. I expect you would be able to stop before reaching the track, if you saw those cars 15 feet before you reached the track."

### E. A. Boyd testified:

"When I was there they had taken the body up, and I met them about 150 yards from the track, going to Sour Lake in a wagon. I was going south to Grayburg on the shell road when I met the body in the wagon. At that time the

train was switching, the train that struck him. They were switching a string of cars. It was the string of cars that they said had killed the boy. It was coming off the track that goes around below the depot on the south side of the main line. At that time they were going west, and had a string of flat cars in ahead. They were pushing across the road, crossing it when I came up. They had already held the inquest when I got there. Besides that train that was on the south switch, I saw some cars standing on the main line. I was going south, and the cars were on the left-hand side from me— that is, on the depot side. When I got there, the string of cars was standing right along here just a short distance from the crossing. It was quite a string of cars there on the main line, and they reached a good piece, as far as the depot, and beyond the depot. I was traveling on horseback, and going south. Coming along the road south from Sour Lake to Grayburg you would have to be mighty close to the crossing before you could clear the string of cars on the main line so you could see up the switch south of the depot. They have very little room to get by the main line string of cars, very little space in between the two tracks from where the main line cars were standing; I mean that there was just clearing space between the rear car standing on the main line and that switch track that led off south of the depot; I mean the closest car on the main line, it was just far enough away from the switch to clear it. The switch stand on the west side is not over 10 feet from the shell road. The closest car to the shell road standing on the main track was about 15 or 20 feet from the center of the shell road. It may not have been quite so much, and it might have been more. If one were coming down the shell road, going to Grayburg, and a train of cars were moving on the switch line south of the depot and joining with the main track at that crossing, you would have to be right on the railroad before you could see those moving cars beyond the standing train on the main line. You could not see it at any distance. You could not see it but a short distance. The south track is lower than the main line track, and that would naturally hide a train or engine, or anything else. If it was on a level, you could see the top of the engine—notice it quickly. No, sir; the train of cars standing on the main line would prevent you seeing a moving train on the switch at all. * * * I think those were flat cars they were pushing in front of the engine, about eight or ten of them. * * * I do not know how long it was before the accident occurred that I got there. They had picked up the body. It was the same day. I think it was in the afternoon. It was the day of the accident, and I met them about 150 yards from the crossing, carrying the body to Sour Lake. The string of cars was moving across the crossing, and a string of box cars was standing on the main line. The moving cars were going west off the switch track."

Van Dorn, defendant's roadmaster, testified:

"If a string of box cars were standing on the main track just so it would clear the switch, a man would have to be within 50 feet of the track before he could begin to see down the house track. Yes, sir; You could not begin to see down the

house track further down the end of the car standing on the main line; and, of course, the closer you got the further down the house track you could see. That is a fact I know. I could see beyond the end of the box car standing 50 fet north of the crossing on the shell road. I could see down the house track down beyond the end of the box car that would be standing on the main line, and me standing 50 feet north of the crossing."

Badgett, defendant's superintendent, testified:

"I think a man would have to get within 55 or 60 feet of the rail approaching on the shell road before he could see a moving car coming toward the crossing, if the box cars were standing clear of the switch on the east side of the shell road. If a box car was standing within 15 feet of the shell road, you would have to go to the center of the crossing. You could not shove cars out of the main line, with cars within 15 feet of the crossing, without turning them over. Yes, sir; a car out there would cut off the view entirely; but you could not move the car out of this track with a car 15 feet from the crossing. * * * The turn-out, to use a particular illustration, is where the house track switch leads off from the main line—merely another name for turning off from the main line. It would be about 150 feet east of the frog from the turn-out where it reaches a point where the tracks are 60 feet apart. At a distance of 150 feet east of the shell road the two tracks would be about 14 feet apart. A box car will hang over on an average of 3 feet from the rail—that is, the body of the car. If you put two box cars, one on the main line and one on the house track, 150 feet from the shell road, they would be about 6 feet apart; there would be space between them of about 5 or 6 feet. * * * As to whether I say they were running a store not any bigger than a piano box, it was a hamburger and sandwich stand. A man had just about room enough to walk in, but did not have any room to stand. It stood on the ground, and was about 5 or 5½ feet high. It was about 4 feet wide and 6 feet long. As to whether the man carried it home with him every night, if there was anything in it very valuable, it would pay him, because somebody else could have come along and carried it away. Some one did carry it away. No, sir; the railroad did not move it, and did not order it off. It stood on the right of way. * * *"

Bennett testified for defendant:

"I live at Sour Lake; have lived there five years. I have traveled the road from Sour Lake to Grayburg frequently, and am acquainted with the crossing over the Frisco where Alfred Moye is supposed to have been killed. * * * On the north side of the track, along the shell road, and on your left as you approach, you notice a little hamburger joint, right near, probably on, the right of way, not more than 30 or 40 feet from the railroad track. It was about the size of an ice box, a good, big ice box. It was just a little hamburger joint. The house was probably 40 or 50 feet from the stand. That stand was maybe 6½ feet high. In traveling along the shell road in a buggy or automobile, you could see a box car. It was nothing like as

high as a box car. The closest building to it was a house built for a saloon; but the mill company kicked, and they never did put it in, and it was used for a residence by several people. It was probably 50 or 60 feet from the stand; I never paid much attention. * * * Now, approaching that crossing on that shell road, and bearing in mind the location of those buildings, as to how near you would have to be to see up the track at Grayburg, if you mean the one that goes around on the south side of the depot, that house would not be in the way nowhere, unless you got out of the road."

On cross-examination he testified:

"One approaching on the shell road, in order to see cars approaching on the house track, meaning the track that runs east of the shell road around the depot, and goes back to the main line toward Beaumont, one could see those cars at a distance of 50 or 75 yards from the track, maybe 100. He could see them by the time he was in front of this dwelling or this house built for a saloon. * * * If there were box cars on the main line between where you are when you come out in front of that house, you could see box cars on the house track after you got in front of that house. Yes, sir; if the house track was lower than the main track, that would let the cars on it down lower than the top of the cars on the main line. Then you could not see a box car, not from that house, and not over another box car."

Mr. Ogg testified for defendant:

"I live at Sour Lake, and am now engaged in the real estate business. * * * I am acquainted with the structures on the left of the shell road as you approach the crossing from Sour Lake. There was an old building, built for a saloon, and then a little hamburger joint. The building was 75—probably 100—feet from the track, and about 10 or 12 feet from the embankment on the shell road. It had a porch in front of it. The hamburger shack was setting right south of the old house, right at the edge of the shell road. The top of it was 6 or 8 feet from the ground. The shell road as you approach that crossing would be a little higher than the ground, but one would have to be some distance back to see over the top of that shack, sitting in an automobile or buggy. If you got opposite the shack, I do not believe you could see over it; but if you were some distance back, I believe you could see over it. If box cars were approaching on the track that leads around the depot, one of the switches, it could be easily seen. There would be nothing to keep you from seeing it as you approached. The hamburger joint would not obstruct the view of the box cars. The size of that hamburger shack was 6 or 8 feet high and about 4 or 5 feet in width. * * * Supposing there were box cars standing on the main line between you and the moving or standing box car on the house track; I mean a string of box cars on the main line, and another one on the other side of it; I would not think I could see them then."

James Lisch, defendant's conductor in charge of the switching on the day of the accident, testified:

"I was standing in front of the depot on the main line when the train started to move toward the crossing, not when it hit. I did not see it strike. It was making the last one of those moves that I have described at the time the accident happened. After the accident the train stopped and stood there until after the inquest—never moved again. We were there from 1:30 to 3:15 in the afternoon before any movement at all. At the time the boy was struck, we were pushing in off of the house track. We left the train on the passing track and the train of cars that hit the automobile on the house track, and we cut our engine loose and went down the main line and headed into the house track. When we got this train made up, as it was left on the house track, the engine was on the rear end of it. The way we got out there was we went down the main line and headed in; we backed down the main line east toward Beaumont, having left the string of cars on the house track until we could get out and go up the main line and get to the rear of them. We left the nearest car to the shell road about a distance of 80 feet. It was in the clear on the house track. An engine or car could pass it on the main line standing there, 80 feet of the shell road, clear of the main line. * * * At the time this string of cars started to move I was standing right in front of the depot. I stood there until they got within about 10 feet of the shell road crossing. I saw the brakeman walk across and throw the switch, and I knew everything was all right, and I started over to seal up two cars. The train did not stop for him to throw the switch. They were going on slow, and it had gotten within 10 feet of the crossing. I did not see the automobile coming. I could see clear up to this house. I did see the negro give them the signal to go ahead. It was his place to do that, even if it was moving. It was the 'come ahead' signal given so the engineer could see, and so I could see it, too. I was watching for it. If he had not given the signal, I would have stopped him before he got to the crossing. He was going slow for that purpose. When he says, 'Come ahead,' we go ahead—throw on more speed. I was on the other side when they stopped, and went around to see what was the matter. They had already stopped, and I did not give the signal for the engineer to stop the train. I could not say who did give the signal to stop. I heard the cars stop, but I did not hear the train hit the automobile. * * * As to whether it is not often the case, when we come in with a train like that, that we bring it up the main line and uncouple on the main line, and then carry out the part we want to separate from the train, and put it on the house track, carry it on past the switch, and across the shell road, throw the switch, and run the cars back on the house track, cut the engine loose, and back up and get the train, and back up and get your string of cars on the house track ahead of your engine, and push them on to Budconnor, I say that I always do it like I told you. Yes, sir; we can do it that way. It is an easy way to do it, and when you do it that way, you would leave your train that you first left near this switch. The reason you have to do that, put part of the train on ahead, is because you have not got the switching facilities at Budconnor; we have to get the train in shape to do what we have to do at Budconnor.

In this instance it was necessary to push the part of the train we had on the house track ahead of us to Budconnor. We could have left the train on the main track, and put those cars on ·the passing track and run around them, but it would have taken longer. Every man does it different; some do it one way, and some another."

Stephenson, the locomotive engineer, testified:

"When we started the movement shoving these cars off the house track, the brakeman and conductor both signaled to move forward. I saw both signals. The brakeman was in the middle of the shell road on the left-hand side at the time he gave the signal, and the conductor was right in front of the depot, on the right-hand side of the depot. I could not see the switch, and do not know whether the switch was thrown, aside from the fact that I was signaled to move forward. From what happened afterwards, I know the switch was thrown, because I looked at it, and saw it had been thrown. If it had not been thrown, it would have broken. * * * I cannot tell exactly how near the lead car was to the dirt road crossing at the time the brakeman and conductor signaled for me to move forward. It was far enough to clear the side track, but I do not know the distance. * * * We were going to stop that train out on the main track, if we had not stopped when we did. No one signaled me to stop."

There are other witnesses who testified with reference to the situation, but the foregoing gives an accurate view of the testimony touching on the question of the negligence of the plaintiff.

### Opinion.

[1, 2] We have given very careful consideration to this record, and are of the opinion that the evidence is not sufficient to show that as a matter of law the plaintiff was guilty of contributory negligence. The conditions as they actually existed at the time of this accident, in view of the testimony of the two girls, and of those who undertake to detail the location of obstructions to the view of the driver, are such as tend to support the finding by the jury that plaintiff was not wanting in that degree of care with which he was charged. We cannot say that it is reasonable to conclude that, under the circumstances in which plaintiff was placed, and in view of the situation of the premises, by the exercise of ordinary care he could have discovered the movement of the train.

The evidence is conflicting as to the character of obstruction presented by the dwelling house, the hamburger stand, the box cars on the main line or on the passing track, and it is conflicting as to whether the string of cars which struck the automobile was moving with sufficient speed just before the accident to attract the attention of plaintiff. It appears from the testimony of the conductor that the string of flat cars, with the box car at the end, nearest the crossing, was moving very slowly, and that the box car was in about 10 feet of the crossing when the brakeman gave the signal for the engineer to move ahead. This signal was communicated by the conductor to the engineer; and then, under the testimony, he put on steam and moved forward more speedily than he had been moving. The conductor says that the train, at the time that the signal to move forward was given, was moving so slowly that, with the box car in 10 feet of the crossing, he could have stopped the train before the box car reached the road crossing. This indicates that the movement of the string of cars was such as may have presented the appearance of standing still, even though seen by the plaintiff; and from the testimony it appears that the signal to move forward must have been given at such a time as that plaintiff either did not anticipate a movement before he could cross the track, or else could not stop his car in time to prevent the wreck. All the circumstances detailed in the testimony leave the question of negligence on the part of the plaintiff in such doubt that it becomes proper for the jury to resolve the question at issue. The burden rested upon the defendant to establish contributory negligence excusatory of its own negligence; and we are not prepared to say that it has met this requirement by such clear proof as removes from the jury the province to determine the issue. Following Beck v. Texas Co., 105 Tex. 303, 148 S. W. 295, approved in Tweed v. Western Union Tel. Co., 107 Tex. 247, 166 S. W. 696, 177 S. W. 957, we recommend that the judgment of the Court of Civil Appeals be reversed, and that of the district court be affirmed.

PHILLIPS, C. J. The judgment recommended by the Commission of Appeals is adopted and will be entered as the judgment of the Supreme Court.